WOOD JENKINS LLC
Mary Anne Q. Wood #3539
Stephen Q. Wood #12403
60 E. South Temple, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 366-6060

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| IMPERIAL PREMIUM FINANCE, LLC, | ) | ***OPPOSITION TO IMPERIAL'S*** |
| | ) | ***MOTION FOR EXPENSES AND FEES*** |
| Plaintiff, | ) | ***PURSUANT TO RULE 37(a)(5)(B)*** |
| | ) | |
| v. | ) | |
| | ) | Civil No. 2:09-CV-00861-DB-SA |
| SYLVIA HERSKOWITZ, | ) | |
| | ) | Judge Dee Benson |
| Defendant. | ) | Magistrate Judge Samuel Alba |
| | ) | |

## <u>INTRODUCTION</u>

Plaintiff Imperial Premium Finance, LLC ("Imperial") asserts that it is entitled to

attorneys' fees and expenses on Defendant's Motion to Compel.   Imperial claims that it should be

granted attorneys' fees and expenses because Defendant purportedly (1)"failed to confer in good

faith prior to filing her Motion" and; (2) "Imperial has fully and properly responded to

Herskowitz's discovery requests and provided <u>all</u> of the responsive documents in its possession."[1]

Imperial's representations are demonstrably false.

---

[1] *Memorandum In Opposition to Plaintiff's Motion to Compel and in support of Defendant's* (sic)
*Motion for Expenses and Fees pursuant to Rule 37(a)(5)(B)*("Memo") Docket # 70 at 9-10.

Imperial's unsupported assertion that Defendant failed to meet and confer in good faith is directly rebutted by the 10-page summary and correspondence attached to Defendant's Motion to Compel.   Defendant met and conferred with Imperial for six months, graciously giving months worth of extensions contingent on Imperial's promises that they would correct and supplement their discovery responses.   Imperial took the extensions, then failed to keep their promises.

In addition, Imperial's claim that it has produce all responsive documents is false. Imperial has not produced all responsive documents.   Imperial has only produced its loan transaction file consisting of approximately 1,000 pages of documents.   Defendant's discovery requests seek far more information than is simply contained in the transaction documents.

Furthermore, Ms. Herskowitz's counsel recently discovered, while conducting their own independent research, documents that reveal that Imperial's objections and its representations to the Court and counsel were deceptive.   These documents establish that Imperial's claim that it "has fully and properly responded to Herskowitz's discovery requests and provided all of the responsive documents in its possession[]" is not true.   These documents also establish that Imperial's alleged inability to understand the terms "Insurable Interest," "Stranger Owned Life Insurance," "Investor Initiated Life Insurance," and "business licenses" is beyond disingenuous. Imperial fully understands the meaning of these terms and their relevance to the claims in this case.

Specifically, Ms. Herskowitz's counsel recently discovered that Imperial Holding, Inc., the sole member and owner of Plaintiff Imperial Premium Finance, LLC, filed form 10-K filings with the Securities and Exchange Commission on March 31, 2011, on behalf of the company and all wholly owned subsidiaries, including Plaintiff Imperial Premium Finance, LLC.[2]   Throughout

---

[2] Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at F2-F41 (Entitled "Imperial Holdings and Subsidiaries"); Form 10-K Exhibit 21.1, attached as

discovery, Imperial claimed that the terms "Insurable Interest," "Stranger Owned Life Insurance," "Investor Initiated Life Insurance," and "business licenses" are vague and ambiguous to Imperial. However, Imperial's 10-K statement uses, defines, and specifically addresses these terms.

Similarly, throughout discovery Imperial has feigned ignorance regarding the relevance of these terms and other issues to this case.   Imperial's 10-K filings, however, demonstrate that Imperial is quite knowledgeable regarding the relevance of these subjects.    In fact, claims like Ms. Herskowitz's claims are the very business litigation risks Imperial discloses to its investors in its 10-K filing.   Imperial's 10-K filings discuss in great detail the potential risk of claims that challenge Imperial's business practices as violating the Insurable Interest rule, violating state laws prohibiting "Stranger-Originated Life Insurance" policies or "STOLI schemes," selling insurance or providing premium finance without a proper license, and misrepresentations by agents soliciting people to be involved in its "premium finance transactions."

In addition to demonstrating that Imperial's objections to Defendant's discovery requests are a ruse, Imperial's 10-K filings also demonstrate that Imperial's representation to the Court and opposing counsel that "all of the responsive documents in its possession" have been produced, is not true.   Imperial's 10-K filing itself is a responsive document that was not produced to Defendant in discovery.   Moreover, the substance of Imperial's 10-K filing reveals that Imperial has done significant research and analysis regarding issues such as the Insurable Interest rule, state laws prohibiting STOLI arrangements, regulations and licensing requirements for providing

---

Exhibit B (listing Imperial Premium Finance, LLC as Subsidiary).  In addition to filing its 10-K statement on behalf of Imperial Premium Finance LLC, it is important to note that Imperial Holdings, Inc. and Imperial Premium Finance, LLC share the same managers and the same address: 701 Park of Commerce Boulevard, Suite 301, Boca Raton, Florida 33487.   Thus, Imperial's managers cannot reasonably dispute that it was unaware of the facts contained in Imperial Holdings' 10-K statement.

premium finance transactions, and misrepresentations by its agents soliciting people to be involved in its "premium finance transactions."   It is also obvious that Imperial has been involved in disputes regarding its illicit business practices.   Imperial has refused to respond to interrogatories and produce documents seeking discovery on these issues.

In sum, Imperial's suggestion that the Court should grant Imperial attorneys' fees on Defendant's Motion to Compel is unreasonable.   At a minimum, Ms. Herskowitz is entitled to her fees and expenses.

<u>**FACTS**</u>

As detailed below, Imperial's 10-K filings refute Imperial's claim that terms contained in Defendant's discovery requests are vague, ambiguous, or irrelevant to the claims and defenses in the case.   In order to aid the Court in comparing Imperial's objections and responses to Imperial's 10-K filings, Defendant provides the following citations from Imperial's final amended discovery responses and Imperial's 10-K filings organized by issue.

1. **<u>IMPERIAL'S CLAIM THAT THE TERM "INSURABLE INTEREST" IS VAGUE AND AMBIGUOUS.</u>**

Throughout discovery, Imperial has consistently claimed that the term "Insurable Interest" rule is impermissibly vague.   For Example, Imperial responded to Defendant's Request for Production of Documents on this issue as follows:

**<u>REQUEST NO. 11:</u>**   Please produce any and all documents referring or relating to the "Insurable Interest" rule.

**<u>RESPONSE TO REQUEST NO. 11:</u>**   Imperial objects to Request No. 11 on the basis that it is impermissibly vague with respect to the term "Insurable Interest rule."   Subject to that objection and to the General Objections set for above, Imperial has produced all non-privileged, relevant documents in its possession that are responsive to Request No. 11.

Contrary to Imperial's suggestion, Imperial has not produced any documents relevant to this request.   Moreover, Imperial's 10-K filing demonstrates that Imperial understands what the "Insurable Interest" rule is and is well aware that a court could rule that its premium finance transaction, like the one it solicited Herskowitz to participate in, potentially violates the rule. Imperial's Form 10-K provides in part:

> ***If a regulator or court decides that trusts that are formed to own many of the life insurance policies that serve as collateral for our premium finance loans do not have an insurable interest in the life of the insured, such determination could have a material adverse effect on our business, financial condition and results of operations.***
>
> **All states require that the initial purchaser of a new life insurance policy insuring the life of an individual have an insurable interest in such individual's life at the time of original issuance of the policy.   Whether an insurable interest exists in the context of the purchase of a life insurance policy is critical because, in the absence of a valid insurable interest, life insurance policies are unenforceable under most states' laws.** Where a life insurance policy has been issued to a policyholder without an insurable interest in the life of the individual who is insured, the life insurance company may be able to void or rescind the policy, but must repay to the owner of the policy all premium payments, usually without interest. Even if the insurance company cannot void or rescind the policy, however, the insurable interest laws of a number of states provide that persons with an insurable interest on the life of the insured may have the right to recover a portion or all of the death benefit payable under a policy from a person who has no insurable interest on the life of the insured. **These claims can generally only be brought if the policy was originally issued to a person without an insurable interest in the life of the insured. However, some states may require that this insurable interest not only exist at the time that a life insurance policy was issued, but also at any later time that the policy is transferred.**
>
> Generally, there are two forms of insurable interests in the life of an individual, familial and financial. Additionally, an individual is deemed to have an insurable interest in his or her own life. It is also a common practice for an individual, as a grantor or settlor, to form an irrevocable trust to purchase and own a life insurance policy insuring the life of the grantor or settlor, where the beneficiaries of the trust are persons who themselves, by virtue of certain familial relationships with the grantor or settlor, also have an insurable interest in the life of the insured. **In the event of a payment default on our premium finance loans when we are**

v

**otherwise unable to sell the underlying policy, we will acquire life insurance policies owned by trusts (or the beneficial interests in the trust itself) that we believe had an insurable interest in the life of the related insureds. However, a state insurance regulatory authority or a court may determine that the trust or policy owner does not have an insurable interest in the life of the insured. Any such determination could result in our being unable to receive the proceeds of the life insurance policy, which could lead to a total loss of all amounts loaned in the premium finance transaction or a total loss on our investment in life settlements.** Any such loss or losses could have a material adverse effect on our business, financial condition and results of operations.

Some United States life insurance companies and their trade associations have voiced concerns about the life settlement and premium finance industries generally and the transfer of life insurance policies to investors. These life insurance companies may oppose the transfer of a policy to, or honoring of a life insurance policy held by, third parties unrelated to the original insured/owner, **especially when they may believe the initial premiums for such life insurance policies might have been financed, directly or indirectly, by investors that lacked an insurable interest in the continuing life of the insured.** If the life insurance companies seek to contest or rescind life insurance policies acquired by us based on such aversion to the financing of life insurance policies, we may experience a substantial loss with respect to the related premium finance loans and the underlying life insurance policies, which could have a material adverse effect on our business, financial condition and results of operations. These life insurance companies and their trade associations may also seek additional state and federal regulation of the life settlement and premium finance industries. If such additional regulations were adopted, we may experience material adverse effects on our business, financial condition and results of operations.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 20-21, 25. (emphasis added)

2. **IMPERIAL'S CLAIM THAT THE TERMS "STRANGER OWNED LIFE INSURANCE POLICIES," "INVESTOR OWNED LIFE INSURANCE POLICIES," "INVESTOR INITIATED LIFE INSURANCE POLICIES," "AND THE LIKE" ARE VAGUE AND AMBIGUOUS AND IRRELEVANT TO THIS CASE.**

Throughout discovery, Imperial has consistently claimed that the terms "Stranger Owned

Life Insurance Policies," "Investor Owned Life Insurance Policies," "Investor Initiated Life

Insurance Policies," "and the like" are vague and ambiguous and irrelevant to this case.   For

example, Imperial responded to Defendant's discovery requests on this issue as follows:

> **REQUEST FOR PRODUCTION NO. 10:**   Please produce any and all
> documents referring or relating to Stranger Owned Life Insurance Policies,
> Investor Owned Life Insurance Policies, Investor Initiated Life Insurance Policies,
> and the like.
>
> **RESPONSE TO REQUEST NO. 10:**   Imperial objects to Request No. 10 on the
> basis that it is impermissibly vague with respect to the phrase "Stranger Owned
> Life Insurance Policies, Investor Owned Life Insurance Policies, Investor Initiated
> Life Insurance Policies and the like."   Subject to that objection and to the General
> Objections set forth above, Imperial has produced all non-privileged, relevant
> documents in its possession that are responsive to Request No. 11.
>
> **REQUEST FOR ADMISSION NO. 3:**   Admit that You are aware that Stranger
> Owned Life Insurance Policies, Investor Owned Life Insurance Policies, Investor
> Initiated Life Insurance Policies, and the like violate the "Insurable Interest" rule in
> both the State of New York and the State of Utah.
>
> **RESPONSE TO ADMISSION NO. 3:**   Imperial objects that this request is
> vague and ambiguous as to the undefined terms "Stranger Owned Life Insurance
> Policies," "Investor Owned Life Insurance Policies," "Investor Initiated Life
> Insurance Policies," and impermissibly calls for a legal conclusion.   The reference
> to "and the like" is also vague and ambiguous.   Furthermore, whether or not
> Imperial is "aware that Stranger Owned Life Insurance Policies, Investor Owned
> Life Insurance Policies, Investor Initiated Life Insurance Policies, and the like
> violate the "Insurable Interest" rule in both the State of New York and the State of
> Utah," is irrelevant and not calculated to lead to the discovery of admissible
> evidence.   Without waiver of and subject to the foregoing objections, Imperial
> denies this Request.

Contrary to Imperial's suggestion, Imperial has not produced any documents relevant to

these requests.   Imperial's 10-K filing demonstrates that Imperial's vague and ambiguous

objections are simply discovery gamesmanship.   Imperial understands the terms "Stranger

Owned Life Insurance Policies," "Investor Owned Life Insurance Policies," or "Investor Initiated

Life Insurance Policies." Imperial is fully well aware that many states in which it does business

have laws which define and prohibit STOLI practices.   Imperial is also well aware that the Court

could rule that its premium finance transaction, like the one it solicited Herskowitz to be involved

in, are illegal STOLI arrangements. Imperial's Form 10-K provides in part:

> ***Premium finance loan originations are susceptible to practices which can invalidate the underlying life insurance policy and subject us to material fines or license suspension or revocation.***
>
> **Many states in which we do business have laws which define and prohibit stranger-originated life insurance ("STOLI") practices, which in general involve the issuance of life insurance policies as part of or in connection with a practice or plan to initiate life insurance policies for the benefit of a third party investor who, at the time of the policy issuance, lacked a valid insurable interest in the life of the insured.** Most of these statutes expressly provide that premium finance loans that only advance life insurance premiums and certain permissible expenses are not STOLI practices or transactions. Under these statutes, a premium finance loan, as well as any life insurance policy collateralizing such loan, must meet certain criteria or such policy can be invalidated, or deemed unenforceable, in its entirety. **We cannot control whether a state regulator or borrower will assert that any of our loans should be treated as STOLI transactions or that the loans do not meet the criteria required under the statutes.**
>
> **The legality and merit of "investor-initiated" life insurance products** have also been questioned by members of the industry, certain life insurance providers and certain regulators.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as
Exhibit A at 21. (emphasis added)

> **3. IMPERIAL'S CLAIM THAT IT DOES NOT UNDERSTAND THE TERM "BUSINESS LICENSES" AND WHETHER IT HAS A BUSINESS LICENSE IS IRRELEVANT TO THIS CASE.**

Throughout discovery, Imperial has consistently claimed that the term "Business

Licenses" is vague and ambiguous and that whether it had a business license in the state of Utah or

New York at the time of the transaction is irrelevant to this case.   For example, Imperial

responded to Defendant's discovery requests on this issue as follows:

> **INTERROGATORY NO. 3:**   If you contend that You were licensed to do business in the States of New York or Utah from March 16, 2007 to the present,

please state: all facts that support or relate, in whole or in part, to this contention, identify all documents regarding the same, and identify all persons with knowledge of these facts.

**ANSWER TO INTERROGATORY NO. 3:**   Subject to and without waiving the General Objections set forth above, Interrogatory No. 3 is impermissibly vague and ambiguous as to the phrase "licensed to do business."   Furthermore, whether or not Imperial was "licensed to do business in the States of New York or Utah from March 16, 2007 to the present" is irrelevant and not calculated to lead to discovery of admissible evidence.   Subject to and without waiver of the foregoing objections, Imperial is not aware of a required business license in the States of Utah and New York for the business transaction at issue in this lawsuit.

**REQUEST FOR PRODUCTION NO. 12:**   Please produce all business licenses under which You operate.

**RESPONSE TO REQUEST NO. 12:**   Imperial objects to Request No. 12 on the basis that it is overly broad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.   Imperial also objects to Request No. 12 on the basis that it is impermissibly vague with respect o the phrases "business licenses" and "under which You operate.   Subject to these objections and to the General Objections set forth above, Imperial states that it is not aware of business licenses that are required for Imperial's involvement in the transaction at issue; therefore, this Request does not call for the production of any relevant documents.

Imperial has not produced information or documents relevant to these requests.

Imperial's 10-K filings reveal that Imperial understands the term "business license" and also

understanding that whether it had a business license in Utah and New York is highly relevant to

this case.   Imperial's 10-K statement provides as follows:

**Risk Factors Related to Premium Finance Transactions**

The making, enforcement and collection of premium finance loans is extensively regulated by the laws and regulations of many states and other applicable jurisdictions.   These laws and regulations vary widely, but often:

- require that **premium finance lenders be licensed by the applicable jurisdiction**;

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 20. (emphasis added)

**With respect to premium finance, obtaining the requisite state licenses** and developing a network of referring agents is time intensive and expensive.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 14. (emphasis added)

### 4. IMPERIAL'S CLAIM THAT INFORMATION REGARDING ITS AGENTS IS IRRELEVANT TO THIS CASE AND THAT DISCOVERY ON THIS ISSUE IS INTENDED TO HARASS IMPERIAL.

Throughout discovery, Imperial refused to provide discovery regarding James Garfinkel and Suzanne Rubio. Mr. Garfinkel and Ms. Rubio are insurance agents who played a part in the solicitation of Ms. Herskowitz to participate in the transaction. Imperial claims that discovery regarding these individuals and their participation in this transaction and similar transactions is "overly broad, unduly burdensome, intended to harass the Plaintiff, irrelevant and not calculated to lead to the discovery of admissible evidence." For example, Imperial responded to Defendant's discovery requests on this issue as follows:

**REQUEST NO. 16:** Please produce any and all documents referring or relating to Suzanne Rubio.

**RESPONSE TO REQUEST NO. 16:** Imperial objects to Request No. 16 on the basis that it is overly broad, unduly burdensome, intended to harass the Plaintiff, irrelevant and not calculated to lead to the discovery of admissible evidence. Subject to that objection and to the General Objections set forth above Imperial has produced all relevant non-privileged documents in its possession that are responsive to Request No. 16.

**REQUEST NO. 1:** Please produce any and all documents referring or relating to James Garfinkel.

**RESPONSE TO REQUEST NO. 1:** Imperial objects to Request No. 1 on the basis that it is overly broad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Subject to that objection and to the General Objections set forth above Imperial has produced all non-privileged, relevant, documents in its possession that are responsive to Request No. 1.

**INTERROGATORY NO. 4:**   Please state the nature of Your relationship with James Garfinkel and identify all contacts, correspondence, documents, contracts, agreements both oral and written, payments, loan applications and loan agreements, relating to James Garfinkel and identify all persons with knowledge of these facts.

**ANSWER TO INTERROGATORY NO. 4:**   Subject to the General Objections set forth above, and without waiving any such objections, Imperial responds as follows:   James Garfinkel has never entered into a contract or any other type of agreement with Imperial.   Imperial has never paid directly to Mr. Garfinkel any money on account of the Policy or the Loan.   Mr. Garfinkel is not and has never been an employee or agent of Imperial.   Imperial is unaware of Mr. Garfinkel's involvement in any other life insurance policy for whose premiums Imperial loaned money.

**INTERROGATORY NO. 9:**   Referring to Your response to Interrogatory Nos. 6 and 7, please identify any and all life insurance policies, life insurance loans or life insurance financing agreements that Suzanne Rubio either solicited, contacted, sold, referred or was in any way involved in the transaction.

**ANSWER TO INTERROGATORY NO. 9:**   Imperial incorporates herein its responses to Interrogatories Nos. 6 and 7.   Further, Interrogatory No. 9 is overly broad and unduly burdensome, intended to harass the Plaintiff, irrelevant and not calculated to lead to the discovery of admissible evidence inasmuch as it request information about transaction not at issue in this lawsuit.

Contrary to Imperial's suggestion, Imperial has not produced all documents and information relevant to these requests.   Imperial's responses are evasive and deceptive.   For example, rather than addressing what its relationship with Mr. Garfinkel is, Imperial lists the relationships it purports not to have with Mr. Garfinkel.   See Answer to Interrogatory #4 (stating that Imperial has no contract with Garfinkel and that Garfinkel is not an employee).   Imperial's answer evasively refuses to address the relationships it has with its referring agents, including Garfinkel.   Imperial's 10-K filings reveal that Imperial understands the role its agents play in soliciting people to enter into its "premium finance transactions," the commissions they receive, and the potential that the agent will engage in fraud.   Imperial's Form 10-K provides in part:

We generate revenue from our premium finance business in the form of agency fees from referring agents, interest income and origination fees as follows:

- *Agency Fees* — **We charge the referring agent an agency fee for services related to premium finance loans.** Agency fees as a percentage of the principal balance of the loans originated during the year ended December 31, 2010 and December 31, 2009 were 48.8% and 50.6%, respectively. These agency fees are charged when the loan is funded and collected on average within 46 days thereafter.

 . . . .

**Our premium finance borrowers are currently referred to us through independent insurance agents and brokers licensed under state law**. Prior to January 2009, we originated some premium finance loans that were sold by life insurance agents that we employed. **Once a potential borrower has been referred to us**, we assess the borrower's creditworthiness and the fair value of the life insurance policy to serve as collateral. We further support our loan origination efforts with specialized sales teams that guide agents and brokers through the lending process.

. . . .

When we approve a premium finance loan, the borrower executes a loan agreement and other related documents, which contain representations, warranties and guaranties from the insured and **representations and warranties from the referring agent or broker in regard to the accuracy of the information provided to us and the issuing life insurance company**. The funds required to cover all of the premiums due during the term of a premium finance loan are wired up front directly to the borrower.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 2-3. (emphasis added)

A life insurance policy is issued to the irrevocable trust and the **life insurance agent/broker involved in the issuance of the policy receives a commission from the issuing life insurance agency.**

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 7. (emphasis added)

***Our success in our premium finance business depends on maintaining relationships within our referral networks.***

We rely primarily upon agents and brokers to refer potential premium finance customers to us. . . . .Our ability to build and maintain relationships with our agents and brokers depends upon the amount of agency fees we charge and the value of the services we provide. For the year ended December 31, 2010, our top ten agents and brokers referred to us approximately 31.02% and 50.13%, respectively, of our

premium finance business, based upon the loan maturity balances of the loans originated during such period. The loss of any of our top-referring agents and brokers could have a material adverse effect on our business, financial condition and results of operations.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 20.

> In the ordinary course of business, **<u>our sales team receives inquiries from life insurance agents and brokers regarding the availability of premium finance loans for their clients.</u>** However, any communication between the life insurance agent and the potential policyholder or insured is beyond our control and we may not know whether a life insurance agent discussed with the potential policyholder or the insured the possibility of a premium finance loan by us or the subsequent transfer of the life insurance policy in the event of a payment default under the loan. Consequently, notwithstanding the representations and certifications we obtain from the policyholders, insureds and the life insurance agents, **<u>there is a risk that we may finance premiums for policies subject to contest or rescission by the insurance carrier based on fraud or misrepresentation</u>** in any information provided to the life insurance company, including the life insurance application.

Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011, attached as Exhibit A at 23. (emphasis added)

## <u>ARGUMENT</u>

### I.     IMPERIAL'S MOTION FOR FEES IS PREMATURE.

Imperial moves for attorneys' fees and expenses under Federal Rule of Civil Procedure 37(a)(5)(B).   Imperial makes its motion for fees before the Court has ruled on Defendant's Motion to Compel.   The language of Rule 37(a)(5)(B) suggests that Imperial's Motion is premature.   Rule 37(a)(5)(B) provides:

> If the Motion Is Denied. **If the motion is denied**, the court may issue any protective order authorized under Rule 26(c) and must, **after giving an opportunity to be heard**, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

The language of Rule 37(a)(5)(B) suggests that the issue of reasonable attorneys' fees and expenses should be addressed after the Court has ruled on Defendant's Motion to Compel, not concurrently therewith.   Imperial's Motion could be denied on that basis alone.   On the merits, Imperial's Motion should be denied because Defendant's Motion to Compel was substantially justified and an award of expenses would be unjust.

At the time of filing, Defendant's Motion to Compel was substantially justified.   For more than six months, Imperial had waged a campaign to frustrate Defendant's legitimate attempts at discovery.   Rather than cooperatively participating in discovery as required by the Federal Rules of Civil Procedure, Imperial refused to answer discovery based on unsupported boilerplate objections.   The details of Imperial's improper responses and Ms. Herskowitz's good faith attempts to resolve the discovery dispute are set forth in Defendant's Motion to Compel. (Docket No. 62).   Defendant's moving papers and the attached correspondence demonstrate substantial

justification.   In addition, the recent discovery of Imperial's 10-K filings further demonstrate

substantial justification because they establish that Imperial has advanced disingenuous

objections, and, contrary to its representation to the Court, has not produced all responsive

documents.

**II.      AN AWARD OF ATTORNEY'S FEES TO IMPERIAL IS UNJUSTIFIED
BECAUSE IMPERIAL'S DISCOVERY RESPONSES AND ITS MEET AND
CONFER EFFORTS DO NOT MEET THE STANDARDS FOR CONDUCT
UNDER THE FEDERAL RULES OF CIVIL PROCEDURE.**

As detailed above, Imperial's repeated claims that various terms are vague, ambiguous or

irrelevant cannot reasonably be reconciled with Imperial's 10-K filings.   Imperial knows what

these terms mean and fully understands why they are relevant to this case.   Furthermore, Imperial

has not produced all responsive documents or fully responded to discovery as it has represented to

the Court and to counsel.   Defendant's Motion to Compel is substantially justified.

Consequently, awarding Imperial its fees associated with Defendant's Motion to Compel is

manifestly unjust.

In addition, Imperial's 10-K filings provide further evidence for granting Defendant's

Motion to Compel and its request for an award of attorney's fees and expenses.   Imperial's 10-K

filings also raise serious questions about whether Imperial has engaged in discovery misconduct

that merits additional consideration by the Court.

Fed.R.Civ.P. 26 imposes an affirmative duty upon lawyers to engage in discovery in a

responsible manner and to conduct a "reasonable inquiry" to determine whether discovery

responses are sufficient and proper.   Fed.R.Civ.P. 26(g); Fed.R.Civ.P. 26 Advisory Committee

Notes (1983 Amendment);   *see e.g.*, *Nat'l Assoc. of Radiation Survivors v. Turnage*, 115 F.R.D.

543, 557-58 (N.D.Cal.1987) (holding in case where sanctions imposed for withholding of

documents that "a reasonable inquiry into the factual basis of its discovery responses as well as the factual basis of subsequent pleadings, papers, and motions based on those responses . . . would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information.").

The Federal Rules provide for sanctions against parties and individual attorneys who are remiss in complying with this discovery obligation. *Qualcomm Inc. v. Broadcom Corp.*, 2008 U.S. Dist. LEXIS 911, 2008 WL 66932 (S.D.Cal. Jan. 7, 2008) vacated in part on other grounds, 2008 WL 638108 (S.D.Cal. March 5, 2008) at *7. Fed. R. Civ. P. 26 (g)(1) requires that "[e]very disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name." <u>By signing, an attorney or party certifies that the information is correct to the best of the person's knowledge, information, and belief formed after a "reasonable inquiry."</u> *Id*. If an attorney makes an incorrect certification without substantial justification, the court "**must** sanction the attorney, party, or both." *Qualcomm* at *7, citing Fed.R.Civ.P. 26(g)(3). If a party, without substantial justification, fails "to amend a prior response to discovery as required by Rule 26(e)(2)," the court may prevent that party from using that evidence at trial or at a hearing and impose other appropriate sanctions, including the payment of attorney's fees. *Id*. citing Fed.R.Civ.P. 37(c)(1).[3] As the Advisory Committee notes explain:

---

[3]The United States Supreme Court confirmed that Rule 26(g), like Rule 11, requires that the court impose "an appropriate sanction" on the attorney; in other words, one which is commensurate with the discovery harm. *Qualcomm* at *7 citing, Fed. R. Civ. P. 26(g)(3); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

> **Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37.   In addition, Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions.   This subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection**. The term "response" includes answers to interrogatories and to requests to admit as well as responses to production requests. [¶] If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse.   With this in mind, Rule 26(g), which parallels the amendments to Rule 11, requires an attorney . . . to sign each discovery request, response, or objection.

Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment). (emphasis added).

As part of its duty to conduct a reasonable inquiry, counsel has a duty to properly communicate with its client to ensure that "all sources of relevant information [are] discovered." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).

Similarly, Rule 37 addresses a variety of discovery failures, including failure to produce documents pursuant to discovery request.   Rule 37 is intended to encourage and enforce strict adherence to the "responsibilities counsel owe to the Court and to their opponents."[4]   Rule 37(c)(1) provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition to or instead of this preclusion sanction, a court, on motion, may impose other sanctions such as "requiring payment of reasonable expenses, including attorney's fees, caused by

---

[4] *National Hockey League* at 640; see also *Penthouse Int'l, Ltd. v. Playboy Enters.*, 663 F.2d 371, 387 (2d Cir.1981).

the failure" and "any of the sanctions authorized under Rule 37(b)(2)(A), (B), and (C)."[5]   These

sanctions include:

(i)     directing that the matters embraced in the order or other designated facts be taken
        as established for purposes of the action, as the prevailing party claims;
(ii)    prohibiting the disobedient party from supporting or opposing designated claims or
        defenses, or from introducing designated matters in evidence;
(iii)   striking pleadings in whole or in part;
(iv)    staying further proceedings until the order is obeyed;
(v)     dismissing the action or proceeding in whole or in part;
(vi)    rendering a default judgment against the disobedient party; or
(vii)   treating as contempt of court the failure to obey any order except an order to submit
        to a physical or mental examination.

Like Rule 26, Rule 37 authorizes the imposition of sanctions for negligence or tactical

intransigence as well as willful or intentional wrongs.[6]   There is no requirement under this rule

that the failure be willful or reckless. *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1343

(9th Cir. 1985) (holding that "sanctions may be imposed even for negligent failures to provide

discovery.").   Moreover, there are no specific requirements for the imposition of sanctions under

Rule 37; rather, the decision is left to the sound discretion of the trial court.[7]

In addition to this rule-based authority, federal courts have the inherent power to sanction

litigants to prevent abuse of the judicial process. *Qualcomm* at 8; citing, *Chambers v. NASCO,

Inc.*, 501 U.S. 32, 44-46 (1991).   Courts are "vested with inherent powers enabling them to

manage their cases and courtrooms effectively and to ensure obedience to their orders. . . .   As a

---

[5] *Communispond, Inc. v. Kelley*, No. 96 Civ. 1487, 1998 WL 473951, at *5 (S.D.N.Y. Aug. 11,
1998) (entering default judgment under both Rule 37(b)(2) and 37(c)).
[6] See *Penthous*e, 663 F.2d at 387; *Beers v. General Motors Corp.*, No. 97-CV-482, 1999 WL
325378, at *4 (N.D.N.Y. May 17, 1999); *Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 356
(E.D.N.Y.1986).
[7] *See Lyell Theatre Corp. v. Loews Corp.*, 91 F.R.D. 97, 99 (W.D.N.Y.1981), aff'd, *220 682 F.2d
37 (2d Cir.1982); *A.V. by Versace, Inc. v. Gianni Versace*, No. 96 Civ. 9721, No. 98 Civ. 0123,
2002 WL 54610, at *7 (S.D.N.Y. Jan. 15, 2002).

function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and assess fines.'" *Id*. citing *Aloe Vera of Am., Inc. v. United States*, 376 F.3d 960, 964-65 (9th Cir. 2004) (citation omitted).   This alternative ground for sanctions is appropriate for "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. citing *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). Regardless of whether sanctions are imposed under the Federal Rules or under the court's inherent power, the decision to impose sanctions lies within the court's sound discretion.[8]

Here, Imperial's 10-K filings raise serious questions regarding whether Imperial's conduct and representations during discovery meet the standards set under the Federal Rules of Civil Procedure.   Imperial's claim that certain terms are vague, ambiguous, or irrelevant in this case, while simultaneously filing documents with the SEC that demonstrate that Imperial fully understands these terms and their relevance, is deeply troubling.

At a minimum, Imperial's conduct raises questions about whether the various discovery certifications signed by Imperial's representatives met the standards set in Rule 26 requiring that the certifier conduct a "reasonable inquiry" to determine whether discovery responses are sufficient and proper.   Imperial's counsel had a duty to properly communicate with its client to ensure that all sources of relevant information were discovered. See *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).   The continued recertification of the same improper objections, in the face of Defendant's meet and confer effort, over three separate amended

---

[8] *Id*. citing *Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1109-14 (9th Cir. 2005) (reviewing sanctions imposed under the court's inherent power); *Payne v. Exxon Corp*., 121 F.3d 503, 510 (9th Cir. 1997) (upholding sanctions imposed under the Federal Rules).

discovery responses, suggest that Imperial's representatives failed to stop and think about the legitimacy of their discovery responses and objections as required by Rule 26.

In addition, Imperial's failure to produce its 10-K filings demonstrates that Imperial's claim that it has produced all responsive documents is false. As noted above, Defendant requested all documents referring or relating to the Insurable Interest rule, Stranger Owned Life Insurance Policies, Investor Owned Life Insurance Policies, and Investor Initiated Life Insurance Policies. Imperial's 10-K filing and any documents and research that were used to prepare it were responsive to Defendant's requests. Imperial failed to produce these documents. At a minimum, Imperial's failure to produce these documents suggests that Imperial's representatives failed to properly communicate with its client to insure that all relevant information was discovered and produced.

The Court can decide whether Imperial's conduct amounts to mere sloppy negligence or a knowing pattern of discovery misconduct. However, Imperial's bald assertion that Defendant failed to meet and confer in good faith and that Imperial has produced all relevant information can no longer been seen as credible.

### III.    IMPERIAL HAS NOT PRODUCED ALL RESPONSIVE DOCUMENTS.

Imperial claims that it is entitled to attorneys' fees because "Imperial has fully and properly responded to Herskowitz's discovery requests and provided all of the responsive documents in its possession." Memo. at 10. Imperial's claim that it has produce all responsive documents is false. Imperial has not produced all responsive documents in its possession. Imperial has only produced its loan transaction file consisting of approximately 1,000 pages of documents.

Defendant's discovery requests seek far more information than is contained in Imperial's token production.

As noted in Defendant's *Reply Memorandum in Support of Motion to Compel* (Docket No. 73), Imperial's claim that it has already produced all responsive documents is simply a misrepresentation perpetrated through a clever sleight of hand.   Imperial's representation is qualified by the statement "relevant to the claims and defenses in this action." Memo. at ii. Imperial believes that the only documents that are relevant to claims and defenses in this action are the actual loan transaction documents.   Thus, Imperial has not produced <u>all responsive documents</u>, but only those Imperial deems to be relevant under its self-servingly narrow interpretation of the claims and defenses in this action.

In addition, contrary to Imperial's suggestion, (Memo. at 2.) several of its responses do not claim that it has produced all responsive documents.   In fact, Imperial has refused to provide any documents regarding several requests pursuant to its unsubstantiated boilerplate objections.[9]

Imperial's 10-K filings also demonstrate that Imperial has not produced all responsive documents.   Imperial's 10-K filing is a responsive document that was not produced to Defendant in discovery.   Moreover, the substance of Imperial's 10-K filing reveals that Imperial has done significant research and analysis regarding issues such as the Insurable Interest rule, state laws prohibiting STOLI arrangements, regulations and licensing requirements for providing premium finance transactions, and misrepresentations by its agents.   Moreover, Imperial 10-K filing demonstrates Imperial has been involved in disputes regarding its business practices.

---

9 *See* Exhibit H attached to Memorandum in Support of Motion to Compel. Response to Requests for Production Nos. 5, 8, 13, 15 (Refusing to provide any documents regarding the highly relevant issues of the trustees in this case [William A. Brown and Bank of Utah]; other lawsuits against Imperial, and the life insurance carrier American National Insurance Co.) .

Defendant's Interrogatories and Requests for Production seek information relating to these and

other issues.   Imperial refused to respond to interrogatories and has not produced documents

seeking discovery on these issues.   Consequently, Imperial has <u>not</u> fully and properly responded

to Herskowitz's discovery requests and provided all of the responsive documents in its possession.

As a result, Defendant's Motion to Compel is substantially justified and an award of attorneys'

fees to Imperial is unjust.

<b><u>CONCLUSION</u></b>

Defendant respectfully requests that the Court deny Imperial's *Motion for Expenses and Fees pursuant to Rule 37(a)(5)(B).*

DATED this 12th day of August, 2011.

WOOD JENKINS LLC


By    s/ Stephen Q. Wood
        Mary Anne Q. Wood
        Stephen Q. Wood
        60 E. South Temple, Suite 500
        Salt Lake City, Utah 84111
        Telephone: (801) 366-6060
        *Attorneys for Defendant Sylvia Herskowitz*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 12, 2011, I electronically filed the foregoing

***OPPOSITION TO IMPERIAL'S MOTION FOR EXPENSES AND FEES PURSUANT TO***

***RULE 37(a)(5)(B)*** with the Clerk of Court using the CM/ECF system, which sent notification of

such filing to the following:

Jonathan O. Hafen
Bryan S. Johansen
Parr Brown Gee & Loveless, P.C.
185 South State Street, Suite 800
Salt Lake City, Utah   84111


s/Stephen Q. Wood

## <u>LIST OF EXHIBITS</u>

1.  Exhibit A - Imperial Holdings, Inc., Form 10-K Annual Report dated March 31, 2011.

2.  Exhibit B - Imperial Holdings, Inc., Form 10-K Annual Report Form 10-K Exhibit 21.1.